UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| KHRISTINE RILEY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 4:11-CV-1535 AGF/NAB |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| | ) |
| Defendant. | ) |

## REPORT AND RECOMMENDATION

This is an action under 42 U.S.C. § 405(g) for judicial review of the Commissioner of Social Security's final decision denying Khristine Riley's ("Riley") application for benefits under Titles II and XVI of the Social Security Act, 42 U.S.C. § 401 *et seq.* and 42 U.S.C. § 1381 *et seq*. Riley alleged disability due to depression. This matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1). ([Doc. #6](#).) Riley filed a Brief in Support of Plaintiff's Complaint. ([Doc. #16](#).) The Commissioner filed a Brief in Support of the Answer. ([Doc. #19](#).)

## I.
## PROCEDURAL HISTORY

On February 25, 2010, Riley applied for a Period of Disability and Supplemental Security Income. She alleged February 25, 2008, as her onset date. (Tr. 110-120.) On May 20, 2010, the Social Security Administration denied both of Riley's claims on initial consideration. (Tr. 52-56.) Riley filed a written request for a hearing in front of an Administrative Law Judge ("ALJ") on July 20, 2010. (Tr. 57-59.) Following a hearing before an ALJ, the ALJ issued a written opinion on April 8, 2011, upholding the denial of benefits. (Tr. 7-18.) On August, 2, 2011, the Appeals Council denied Riley's request for a review. The ALJ's decision thus stands as the

Commissioner's final decision. (Tr. 1-3.) Riley filed this appeal on September 2, 2011. ([Doc. 1](#).)

## II.
## ADMINISTRATIVE RECORD

**A.     Testimony Before the ALJ**

On March 30, 2011, ALJ Amy Klingemann held a hearing. (Tr. 23-43)  Riley appeared with counsel.  Riley and Jeffrey Magrowski, a vocational expert ("VE"), testified at the hearing.

**1.  Claimant's Testimony**

Riley testified that she was 40 years old as of the hearing date. (Tr. 27.) She attended a school for children with behavior problems, where she completed the twelfth grade and earned a diploma. (Tr. 28, 42-43.) She did not recall any behavioral medical diagnosis. (Tr. 43.) She completed a class to become a certified nurse's assistant ("CNA"), but had no other vocational training. (Tr. 28.) She enrolled in a class at a community college to hone her reading skills, but dropped out due to comprehension issues. (Tr. 29.) She did not have a driver's license. (Tr. 42.)

During the fifteen years before the hearing Riley held a variety of jobs. She had trouble remembering exact dates and time periods without notes. (Tr. 33.) She became a CNA at Walnut Whitney Care Center in California. She worked there between six and eight months. (Tr. 32.) She worked as a CNA for another company in California for about six months as well. (Tr. 32-33.) She could not recall working at a home healthcare company called Grancare. (Tr. 31-32.) She worked at Sabbath Manor Residential Care as a housekeeper, but was fired because she did not do her job properly. (Tr. 30.) She worked at Parkside Towers as a housekeeper, where she was also fired. (Tr. 30.) Riley also worked as a cashier and a crew member at Popeye's Chicken. (Tr. 31.) She left Popeye's to work as a home health care aid at Algonquin

nurses. (Tr. 31.) She was fired from Algonquin for theft. (Tr. 31.) Riley testified that she worked at her last job as a cafeteria cashier at the University of Missouri – St. Louis for about a year and a half. She quit because she believed that she was going to be fired. She also said she quit because she felt that her son needed more attention. Riley testified that she "took the easy way out." (Tr. 29.)

Riley testified that she could not work because she felt that she would did not have anything to contribute. (Tr. 33.) She saw a counselor and a psychiatrist at the Hopewell Center. (Tr. 33, 39.) She took sertraline and trazodone daily, but was unsure of their effects. (Tr. 34.) She also took sleeping pills, still had nightmares. (Tr. 34.) Her medication sometimes made her dizzy and gave her stomachaches, but she thought it was possible that this was because she sometimes took the medications on an empty stomach. (Tr. 34.) She ocassionally had headaches. (Tr. 34.)

Riley could watch television, but did not understand the plot. (Tr. 34.) She could read books and magazine articles, but she needed to read them more than once to understand them because the words seemed backwards or scrambled to her. (Tr. 34-35.) She would have to read a written grocery list more than once to understand it, unless it was also verbally communicated. She had trouble remembering things that happened in the first twenty years of her life, and thought that she blocked memories that would scare her or cause her stress. She did not have trouble dealing with other people, but she did not trust them because she believed that others had ulterior motives. (Tr. 35-36.) Riley testified that nightmares disrupted her sleep. (Tr. 37.) She kept her radio on at night to ward off bad dreams. (Tr. 42.)

Riley had a son who was ten years old at the time of the hearing. She did not have her own home, but she and her son stayed with a friend and the friend's boyfriend. (Tr. 36.) She

3

washed dishes, but did no other chores. She was capable of doing housework, doing laundry, and preparing meals. On a typical day, she would take her son to school, come home, try to find something to do, and then pick her son up. (Tr. 36-37.) Riley liked to spend time with her son, ride bikes, and go to the park. She had difficulty reading, but liked to read because she enjoyed the challenge.

Riley received SSI benefits during the 1990s.

Riley testified that she was abused as a child, and as an adult by her son's father. (Tr. 38.) Each day she heard "strong" voices that told her she was unable to or not good enough to do things. The voices also told her that other people were watching and judging her. This led her to not trust herself or others. (Tr. 39.) She also said she suffered from mood swings and cyclical depression prompted by her son's absence. Riley testified that when her son was around, she tried to be pleasant. When he was not around, however, she would succumb to her depression. She said she would then get angry with herself for being depressed. Riley said she had crying spells two or three times a week. (Tr. 40.)

Riley testified that she believed that other people always judged her and talked about her behind her back. Thus, she tried to isolate herself. (Tr. 41-42.) Riley believed she needed counseling, however, she feared that her thoughts and feelings would be used against her. She said, "they're either going to take my son away from me or say that I'm a bad person." (Tr. 40-41.)

### 2. VE Jeffrey Magrowski's Testimony

The VE classified Riley's cashier work as light and unskilled. The VE classified Riley's stocking work as medium and unskilled. The VE classified Riley's home health care work, as she described it, as light and semi-skilled. However, the VE testified that it was typically

4

medium in the national economy and possibly very heavy if the position required lifting patients. The VE classified Riley's housekeeper work as light and unskilled. The VE classified Riley's laundry aide work as light and unskilled. The VE classified Riley's work as a certified nurse assistant as semiskilled and possibly very heavy, if she had to lift patients, but as a medium job in the national economy. The VE classified Riley's "fast food work for a Kentucky Fried Chicken"[1] as light and unskilled. (Tr. 47.)The ALJ posed two hypotheticals to the VE.

First, the ALJ asked whether an individual of Riley's age, education, and past work history could perform any of Riley's past work with the following restrictions: (1) capable of work at all exertional levels; (2) could perform simple repetitive tasks; and (3) have occasional contact with the public, co-workers, and supervisors. The VE testified that such an individual could do Riley's past work as a housekeeper, laundry aide, and stock person. However, the VE opined, the individual could not work as a cashier. (Tr. 47-48.)

Second, the ALJ asked the VE to additionally assume that the hypothetical individual would be absent from work one day each week because of depression and anxiety problems. The VE testified that such an individual could not do any of Riley's past work or any other work in the regional or national economies. (Tr. 48.)

The VE testified that his testimony was consistent with the *Dictionary of Occupational Titles* ("DOT").[2] (Tr. 48.)

**B.     Medical Records**

On November 27, 2007, Riley was voluntarily admitted to the Metropolitan St. Louis Psychiatric Center ("MPC") after going to the emergency room and threatening to commit suicide by taking her friend's pills. She was examined by Radhika Rao, M.D., the attending

---

[1] The record indicates that Riley worked at Jack-in-the-Box, Wendy's, and Popeye's Chicken.
[2] U.S. Department of Labor (4th ed. rev. 1991). The Social Security Administration takes administrative notice of the *Dictionary of Occupational Titles*. *See* 20 C.F.R. §§ 404.1566(d)(1), 416.966(d)(1).

psychiatrist. (Tr. 232-34.) After admission to MPC, Riley denied any suicidal ideation. Dr. Rao noted that Riley participated well in the interview. Dr. Rao found Riley talkative, pleasant, and cooperative. Dr. Rao also noted that despite Riley's self-description of depression, she showed a full range affect and was cheerful. Dr. Rao found Riley's behavior in the interview "overly dramatic." Dr. Rao diagnosed her with depressive disorder not otherwise specified and personality disorder not otherwise specified. She estimated Riley's global assessment of functioning level ("GAF") as 50, and started Riley on Zoloft (a brand of sertraline). (Tr. 234.) While at MPC, Riley participated in on-site and off-site activities and group sessions.

On November 30, 2007, Dr. Rao discharged Riley after performing a mental status examination. (Tr. 229-31.) Dr. Rao found Riley pleasant and cooperative, noting that she made fair eye contact during the examination. Riley had a normal mood, affect, and flow of thought. She denied auditory hallucinations, paranoia, and suicidal thoughts. Riley reported that her medication was helping and denied any side effects. (Tr. 230.) Dr. Rao affirmed the diagnosis of depressive disorder not otherwise specified and personality disorder not otherwise specified, and estimated Riley's GAF as 60. Dr. Rao prescribed Zoloft, and encouraged Riley to attend an outpatient follow-up. (Tr. 231.)

On December 13, 2007, Riley, on referral from MPC, went to the Hopewell Center for a psychiatric evaluation. (Tr. 271-72.) She was diagnosed with post-traumatic stress disorder and major depressive disorder, recurrent, moderate. Her GAF was estimated as 60. (Tr. 271.)

On May 15, 2010, Riley underwent a consultative psychological examination by Angela E. Cass-Prost, Psy.D. (Tr. 249-53.) Riley reported feeling depressed. (Tr. 249.) She said that she quit her job as a college cafeteria cashier because she was under increasing pressure from her supervisors regarding absences tied to her son's school problems. (Tr. 251.) Dr. Cass-Prost

6

found that Riley was able to relate and cooperative during the interview, and her stream of speech and mental activity was within normal limits. Riley's mood was mildly depressed or anxious, and she had a sad affect. Dr. Cass-Prost noted that Riley was "somewhat overly dramatic." Riley's thought content was normal, and she denied suicidal ideation. There were no indications of psychotic symptoms. She had minor difficulty with immediate recall, but her memory was otherwise normal. (Tr. 252.) Dr. Cass-Prost diagnosed Riley with early onset dysthymic disorder and personality disorder not otherwise specified. She estimated Riley's GAF as 59. Dr. Cass-Prost concluded that Riley's mental problems "mildly impacted her ability to perform basic tasks and make decisions required for daily living, mainly in the area of adequately providing a nurturing relationship for her son," could have been mildly impacting "her judgment and interactions in the work setting," and could also have been limiting her ability to socially connect and form relationships with others. (Tr. 253.)

On May 20, 2010, Marsha Toll, Psy.D., completed a Psychiatric Review Technique for Riley. (Tr. 254-64.) Dr. Toll found mild restrictions in activities of daily living; moderate difficulties in social functioning' moderate difficulties in maintaining concentration, persistence, or pace; and one or two episodes of decompensation annually, each of extended duration. (Tr. 262.) Dr. Toll also completed a Mental RFC Assessment. She found that Riley was moderately limited in ten of twenty categories, and not significantly limited in the other ten. (Tr. 265-67.) Dr. Toll concluded that Riley was capable of performing simple work. (Tr. 264.)

On September 21, 2010, Riley went to Hopewell Center for an intake assessment by Angie Dockins, a social worker. (Tr. 283-88.) Riley reported using marijuana when she was feeling depressed. (Tr. 185-86.) Dockins found that Riley dressed appropriately and was properly groomed, but seemed very distracted at the start of the interview. Riley exhibited

7

"racing thoughts" and provided a lot of detail in response to questions. Riley reported that she heard voices that told her negative things about herself and that she felt paranoid about how others perceived her. (Tr. 286.) Her mood was hopeful, her memory was fine, and she was well-oriented. (Tr. 286-87.) Dockins found Riley's insight to be appropriate and her judgment to be good. (Tr. 287.) Dockins believed that Riley's history of sexual abuse affected her daily life, sleep, relationships, and employment. (Tr. 287-88.) She recommended that Riley undergo a psychiatric evaluation. Dockins gave Riley a diagnostic impression of chronic post-traumatic stress disorder, severe bi-polar disorder with psychotic features, and sustained cannabis use in partial remission. She estimated Riley's GAF as 50 currently, and 45 in the past year. (Tr. 288.)

On October 5, 2010, Riley met with Dockins. Dockins helped Riley search for housing and encouraged Riley to develop a positive support system. Riley was pleasant and engaged with Dockins. (Tr. 281-82.)

On October 26, 2010, Riley met with Dockins. They discussed Riley's living situation and children. Riley was cheerful and cooperative. (Tr. 279-80.)

On December 2, 2010, Riley underwent a psychiatric evaluation. She complained of depression, crying spells, and nightmares. (Tr. 273.)

On January 4, 2011, Riley met with Dockins. Dockins noted a diagnosis of major depression. Dockins discussed housing options, and advised Riley on a problem with her roommate. Riley was well-groomed, cooperative, and oriented. She had good judgment and insight, coherent speech, a normal mood and affect, logical thought content, and normal memory. Riley reported seeing a doctor and taking her medications, which she believed helped her. (Tr. 277-78.)

On January 31, 2011, Riley met with Dockins. They discussed a recent death, Riley's pending social security appeal, Riley's son, parenting skills, and how to recognize signs of an impending episode of decompensation. Riley was well-groomed, cooperative, and oriented, with good judgment and insight, coherent speech, a normal mood and affect, logical thought content, and normal memory. Dockins noted a diagnosis of bi-polar disorder. (Tr. 276.)

On February 14, 2011, Riley met with Dockins. Riley was upset and cried during the meeting. Riley reported that she did not take her medications because she was afraid she would be unable to awake from a nightmare. Riley told Dockins she slapped her son, and Dockins discussed disciplinary strategies with her. Dockins also helped Riley sign up for a sexual trauma therapy program at the YWCA. Dockins noted that Riley's insight and judgment were limited. (Tr. 274-75.)

On February 24, 2011, Dr. Habib examined Riley. Dr. Habib found Riley's behavior appropriate and cooperative, her speech coherent, her thought processes logical, and her insight and judgment fair. She had a full range of affect congruent with her mood. Dr. Habib increased Riley's prescription for Zoloft, and continued her prescriptions for trazadone and Seroquel. (Tr. 270.)

**C. Other Records**

On February 25, 2008, Riley completed a work history form. (Tr. 143-160.) She reported working as a cashier at a college cafeteria between 2007 and February 25, 2008; a housekeeper at an adult care center between 2004 and 2006; a housekeeper at a nursing home in 2005; a home health care aide in 2003; and a casher and food preparer at a restaurant for two months in 2003.

9

On February 25, 2010, Riley completed a Disability Report form. (Tr. 165-72.) She indicated that she stopped working on February 25, 2008, because of her depression. (Tr. 166.) She completed the twelfth grade in 1989, but indicated that she had not been in a special education program. (Tr. 167.) She also indicated that she had never completed specialized job training, or a trade or vocational school. (Tr. 167.) She reported the same five jobs as in the Work History Report form. (Tr. 168.) She indicated that she was receiving mental health treatment, but was not taking any medication. (Tr. 169.) She reported that she had been treated with medication and counseling for depression at MPC, and had undergone a psychological examination there in 2007. (Tr. 170.)

On March 19, 2010, Riley completed another work history form. (Tr. 173-184.) In addition to the five jobs identified in the previous form, Riley indicated that she had worked in food preparation at a restaurant in 2001, as a CNA at a nursing home in 1999, and as a laundry aide at a nursing home between 1998 and 1999. (Tr. 173.) Riley also described her duties at each of the eight jobs. In her job as a cashier at the college cafeteria, Riley mainly totaled food orders, but once or twice a day she carried packets of beverages from a loading dock to a storage closet. (Tr. 174.) As a housekeeper at the adult care center, Riley cleaned the residents' rooms and bathrooms. (Tr. 175.) As a housekeeper at the nursing home, Riley cleaned the residents' rooms, bathrooms, and the dining room. (Tr. 176.) As a home health care aide, Riley visited clients' homes, where she did cooking, cleaning, laundry, and trash disposal. (Tr. 177.) As a cashier and food preparer in 2003, Riley prepared chicken and other food for frying, carried supplies into the restaurant, and underwent some cashier training. (Tr. 178.) As a food preparer in 2001, Riley washed dishes, cleaned the lobby floor, and prepared salads. (Tr. 179.) As a CNA in a nursing home, Riley helped residents bathe, eat, and get out of bed into wheelchairs.

10

(Tr. 180.) As a laundry aide in a nursing home, Riley collected, washed, folded, and returned the residents' laundry. (Tr. 181.)

On March 19, 2010, Riley also completed a self-function report. (Tr. 189-200.) She reported living in an apartment with her son, who she cared for by preparing his meals, washing his clothes, bathing him, and reminding him to brush his teeth. (Tr. 189-90.) Her daily activities consisted of waking up at 6:30a.m. or 6:45a.m. and writing in her prayer journal while her son ate breakfast between 7:00 and 7:15. She indicated that she would take a nap after her son went to school and awake around 10:30a.m. or 11:00a.m. to do housework. Sometimes she went to the library to learn how to use a computer. She also picked her son up from school. (Tr. 189.) Her neighbor helped her care for her cat. She was not aware of anything she was able to do before her condition that she is unable to do now. She rarely slept well. (Tr. 190.) She wrote reminders for her to brush her teeth, brush her hair, and get dressed for the day. She did not take any medications. She prepared breakfast and dinner every day. She was able to do household cleaning, laundry, ironing, and dishes, but sometimes required encouragement from a neighbor. (Tr. 191.)

Riley reported that she went outside by herself to pay bills and go shopping when necessary, but she thought that people stared and talked about her. She either walked or used public transportation. She reported that she did not have a driver's license because she did not understand the driving manual and was afraid of other drivers. She could pay bills, count change, and use money orders, but did not have a savings account. (Tr. 192.) Her condition did not impact her ability to handle money. (Tr. 193.) Riley noted that she liked to read, watch television, and spend time with her son. She reported that she did those things "very well." She also reported that there was no change in those activities since her illness began. (Tr. 193.) Two

11

or three times per week, she watched television with her neighbor. She went to church alone twice a month. (Tr. 193.) She reported trouble getting along with other people because she thought they picked on her, stole from her, talked about her, and avoided her. (Tr. 194.) She also thought that authority figures picked on her or singled her out. (Tr. 195.)

She reported trouble with her memory, task completion, concentration, and understanding. She reported a five or ten minute attention span and said that she could not finish what she started. She had trouble following written directions because the words sometimes looked backwards to her. She frequently needed written and verbal instructions to be conveyed to her more than once in order to understand them. (Tr. 194.)

Stress caused Riley to become more depressed and self-critical, which brought her to tears. (Tr. 194.) She said she required reminders when there is a change in her routine. (Tr. 195.)

On March 19, 2010, Riley's friend, Fay Smith, completed a third-party function report that was largely consistent with Riley's self-report. (Tr. 203-13.) Smith had known Riley for eight years. (Tr. 203.) Smith saw Riley three days per week. They played on the computer and went for walks. (Tr. 203.) Smith sometimes had to remind Riley to care for her cat, and they did their laundry together. (Tr. 205.) Smith noted that Riley's cooking abilities and hobbies had remained unchanged since the onset of her condition. (Tr. 205, 207.) Smith said that Riley could handle a savings account. (Tr. 206.) She indicated that Riley sometimes had to be encouraged to go places for herself. (Tr. 207.) Smith opined that Riley had trouble with memory and concentration, would sometimes be "lost" when multiple things were explained to her, and misplace things. Smith reported that Riley needed help and an explanation to understand written instructions. Riley followed verbal instructions well, so long as there were

12

also visual instructions. She got along with authority figures. (Tr. 208.) Smith thought Riley handled stress poorly and sometimes cried. (Tr. 209.)

On July 20, 2010, Riley filled out an updated disability report. (Tr. 216-20.) She said that her condition was getting worse, in that she was increasingly drained emotionally and tired all of the time. (Tr. 218.) She reported that her son was dyslexic, and she was unable to help him with his schoolwork. She had increased trouble sleeping due to nightmares, and would have headaches for two or three days thereafter. She reported that she was no longer taking her psychiatric medications because she believed that they made her condition worse. She reiterated her fears that other people talked behind her back, and that her son would be taken away from her. (Tr. 219.)

On February 16, 2011, Riley completed a Recent Medical Treatment form. She saw Dr. Habib, but she was awaiting a diagnosis from him. (Tr. 222.) Riley took trazodone and sertraline as prescribed by Dr. Habib. (Tr. 233.) She also met with Angie Dockins every other week. (Tr. 222.)

## III.
## ALJ DECISION

The ALJ first found that Riley met the insured status requirements of the Social Security Act through March 31, 2013. (Tr. 12.) At step one, the ALJ found that Riley had not engaged in substantial gainful activity since February 25, 2008. (Tr. 12.) At step two, the ALJ determined that Riley suffered from the severe impairments of post-traumatic stress disorder and depression. (Tr. 12-14.) At step three, the ALJ concluded that Riley's impairments neither met nor medically equaled a listed impairment. (Tr. 14-15.) The ALJ determined that Riley's RFC allowed her to work at a full range of exertional levels, but that she was limited to "simple repetitive tasks with occasional interaction with co-workers, supervisors, and the public." (Tr.

13

15-17.) At step four, the ALJ found that Riley was capable of performing her past relevant work as a housekeeper and a laundry aide, both as Riley actually performed those jobs and as they are generally performed in the national economy. (Tr. 17.) Because Riley could perform her past relevant work, the ALJ concluded that Riley was not disabled within the meaning of the Social Security Act. (Tr. 17.)

## IV.
## LEGAL STANDARD

A court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Gowell v. Apfel*, 2542 F.3d 793, 796 (8th Cir. 2001). Substantial evidence is less than a preponderance, but is enough so that a reasonable mind would find it adequate to support the ALJ's conclusion. *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000). As long as there is substantial evidence on the record as a whole to support the Commissioner's decision, a court may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992). In determining whether existing evidence is substantial, a court considers "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000) (quoting *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999)).

To determine whether the decision is supported by substantial evidence, the Court is required to review the administrative record as a whole to consider:

(1) the credibility findings made by the Administrative Law Judge;
(2) the education, background, work history, and age of the claimant;
(3) the medical evidence from treating and consulting physicians;
(4) the plaintiff's subjective complaints relating to exertional and non-exertional impairments;

14

(5) any corroboration by third parties of the plaintiff's impairments; and
(6) the testimony of vocational experts when required which is based upon a proper hypothetical question.

*Brand v. Secretary of Dep't of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th Cir. 1980).

Disability is defined in the social security regulations as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 416(i)(1); 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 404.1505(a); 20 C.F.R. § 416.905(a). In determining whether a claimant is disabled, the Commissioner must evaluate the claim using a five-step procedure.

First, the commissioner must decide if the claimant is engaging in substantial gainful activity. If the claimant is engaging in substantial gainful activity, he is not disabled.

Next, the Commissioner determines if the claimant has a severe impairment which significantly limits the claimant's physical or mental ability to do basic work activities. If the claimant's impairment is not severe, he is not disabled.

If the claimant has a severe impairment, the Commissioner evaluates whether the impairment meets or exceeds a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment satisfies a listing in Appendix 1, the Commissioner will find the claimant disabled.

If the Commissioner cannot make a decision based on the claimant's current work activity or medical facts alone, and the claimant has a severe impairment, the Commissioner reviews whether the claimant can perform his past relevant work. If the claimant can perform his past relevant work, he is not disabled.

If the claimant cannot perform his past relevant work, the Commissioner must evaluate whether the claimant can perform other work in the national economy. If not, the Commissioner declares the claimant disabled. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.

When evaluating evidence of pain or other subjective complaints, the ALJ is never free to ignore the subjective testimony of the plaintiff, even if it is uncorroborated by objective medical evidence. *Basinger v. Heckler*, 725 F.2d 1166, 1169 (8th Cir. 1984). The ALJ may, however, disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole. *See, e.g., Battles v. Sullivan*, 992 F.2d 657, 660 (8th Cir. 1990). In considering the subjective complaints, the ALJ is required to consider the factors set out by *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984), which include:

> claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the objective medical evidence; (2) the subjective evidence of the duration, frequency, and intensity of plaintiff's pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the dosage, effectiveness and side effects of any medication; and (6) the claimant's functional restrictions.

*Id*. at 1322.

## V.
## DISCUSSION

Riley alleges one point of error. Riley argues that the ALJ's decision is not supported by substantial evidence at step four of the sequential evaluation process because the VE's testimony conflicts with the *DOT*. The Commissioner argues that any conflict between the VE's testimony and the *DOT* is irrelevant because the ALJ found that Riley could perform her past relevant work as she actually performed it, not as described in the *DOT*. Because the VE's testimony does not conflict with the *DOT* and because substantial evidence as a whole supports the ALJ's decision, the undersigned recommends that the Commissioner's decision be affirmed.

16

"[A]n ALJ cannot rely on expert testimony that conflicts with the job classifications in the [*DOT*] unless there is evidence in the record to rebut those classifications." *Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 979 (8th Cir. 2003) (citing *Porch v. Chater*, 115 F.3d 567, 572 (8th Cir. 1997)). Social Security Ruling 00-4p, 2000 WL 1898704 (Dec. 4, 2000), adopted this rule and imposed affirmative duties on the ALJ to (1) ask whether a VE's testimony about job requirements conflicts with the *DOT*, (2) obtain a reasonable explanation for an apparent conflict, and (3) resolve such a conflict before relying on a VE's testimony. *Id.* at *4; *see Renfrow v. Astrue*, 496 F.3d 918, 920-21 (8th Cir. 2007) (citing SSR 00-4p); *see also Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007); *Prochaska v. Barnhart*, 454 F.3d 731, 735 (7th Cir. 2006); *Rutherford v. Barnhart*, 399 F.3d 546, 556 (3d Cir. 2005); *Hackett v. Barnhart*, 395 F.3d 1168, 1174-75 (10th Cir. 2005). Riley argues that the VE's testimony conflicted with the *DOT* and that the ALJ failed to reconcile that conflict, requiring a remand to the Social Security Administration.[5]

A claimant who can perform his or her past relevant work, as he or she actually performed it, is not disabled at step four even though the claimant would be unable to perform that work as it is generally performed in the national economy. *See Wagner v. Astrue*, 499 F.3d 842, 853 (8th Cir. 2007) (quoting *Jones v. Chater*, 86 F.3d 823, 826 (8th Cir. 1996)); *see also Lowe v. Apfel*, 226 F.3d 969, 973 (8th Cir. 2000) ("Where the claimant has the residual functional capacity to do either the specific work previously done or the same type of work as it is generally performed in the national economy, the claimant is found not to be disabled.") (citing *Jones*, 86 F.3d at 826; 20 C.F.R. §§ 404.1520(e); 416.920(e)). The ALJ found that Riley was able to perform her past relevant work as a housekeeper and a laundry aide as she had

---

[5] Riley does not challenge any of the ALJ's other findings, including the ALJ's assessment of Riley's RFC.

actually performed them, but this finding was based on the VE's testimony. The VE testified that his opinion was consistent with the *DOT*, and did not suggest that Riley's past work as a housekeeper and a laundry aide, as performed, was in any way different from the way that work is ordinarily done in the national economy or as defined in the *DOT*. SSR 00-4P precludes the use of VE testimony if there is an unresolved conflict with the *DOT*, so it is necessary to determine whether the VE's testimony conflicted with the *DOT*.

In support of her argument, Riley first notes that the *DOT* specifies a level of "reasoning development" for each job. A person with level 1 reasoning can "[a]pply commonsense understanding to carry out *simple one- or two-step instructions* [and] [d]eal with standardized situations with occasional or no variables in or from these situations encountered on the job." *DOT*, at 1011 (emphasis added). A person with level 2 reasoning can "[a]pply commonsense understanding to carry out *detailed but uninvolved written or oral instructions* [and] [d]eal with problems involving a few concrete variations in or from standardized situations." *Id.* (emphasis added). Riley argues that her inability to do more than perform simple, repetitive tasks is consistent with level 1 reasoning, not level 2 reasoning. Riley then cites to three jobs in the *DOT* that require level 2 reasoning, arguing that those three jobs are the jobs identified by the VE and the ALJ as constituting her past relevant work.[6] She concludes that remand is required to resolve this purported conflict between her abilities and the testimony of the VE.

A similar argument has been considered by the Eighth Circuit. *See Moore v. Astrue*, 623 F.3d 599, 604-05 (8th Cir. 2010). The claimant in *Moore* was "capable of carrying out simple

---

[6] Riley matches Laundry Worker I (*DOT* no.361.684-014, at 260) and Laundry Worker II (*DOT* no. 361.685-018, at 260) with her work as a laundry aide. She matches Cleaner, Hospital (*DOT* no.323.687-010, at 248) with her work as a housekeeper, though it seems more likely that her work as a housekeeper is better classified as Cleaner, Housekeeping (*DOT* no. 323.687.014, at 248), which generally only requires a reasoning level of 1. However, whether Riley's past work as a housekeeper is better categorized as a Cleaner, Hospital or a Cleaner, Housekeeping, need not be resolved in order to decide this case.

18

job instructions and performing simple, routine, and repetitive work activity at the unskilled task level." *Id.* at 604 (internal quotations omitted). The VE in *Moore* testified that the claimant was able to perform two jobs, both of which required level 2 reasoning under the *DOT*. *Id.* The claimant argued that this inconsistency undermined the VE's testimony. *Id.*

The court rejected this argument:

In the hypothetical, the ALJ did not limit "simple" job instructions to "simple *one- or two-step* instructions" or otherwise indicate that Moore could perform only occupations at a *DOT* Level 1 reasoning level. Indeed, the Level 2 reasoning definition refers to "detailed but *uninvolved*" instructions. *DOT* at 1011 (emphasis added). The dictionary defines "uninvolved" as "not involved," and in turn defines "involved" as "complicated, intricate." *Webster's Third New Int'l Dictionary* 1191, 2499 (2002). There is no direct conflict between "carrying out simple job instructions" for "simple, routine and repetitive work activity," as in the hypothetical, and the vocational expert's identification of occupations involving instructions that, while potentially detailed, are not complicated or intricate.

*Id.* The court noted that the *DOT* describes maximum job requirements, and that many jobs are not as rigorous as their corresponding listings might indicate. *Id.* (citing *Page v. Astrue*, 484 F.3d 1040, 1045 (8th Cir. 2007); *Wheeler v. Apfel*, 224 F.3d 891, 897 (8th Cir. 2000); *DOT* at xiii). The court held that the VE's testimony did not, therefore, conflict with the *DOT*. *Id.* at 605.

Here, the ALJ found that Riley was able to perform "simple, repetitive tasks." (Tr. 15.) The ALJ did not find that Riley was unable to perform more than one- or two-step instructions. This is consistent with the ability to carry out the "detailed but uninvolved" instructions contemplated by the *DOT*'s description of level 2 reasoning. Because there was no apparent conflict between the *DOT* and the VE's testimony, there was no need for the ALJ to engage in any reconciliation. The ALJ thus appropriately relied on the VE's testimony, which was substantial evidence supporting the ALJ's finding that Riley could perform her past relevant

19

work as a housekeeper and laundry aide. Further, a review of the record indicates that substantial evidence supports each of the ALJ's factual findings.

## VI.
## CONCLUSION

For the reasons set forth above, the undersigned finds that substantial evidence on the record as a whole supports the Commissioner's decision that Riley is not disabled.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the relief sought by Riley in her Complaint ([Doc. #1](Doc. #1)) and Brief in Support of Plaintiff's Complaint ([Doc. #16](Doc. #16)) be **DENIED** and that judgment be entered in favor of the Commissioner.

The parties are advised that they have fourteen (14) days in which to file written objections to these recommendations pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. *See Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).

Dated this <u>14th</u> day of August, 2012.

                                                                  /s/ Nannette A. Baker
                                                                 NANNETTE A. BAKER
                                                                 UNITED STATES MAGISTRATE JUDGE